## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STEVEN SCHRAGE, <br> 211 Franklin Street, <br> Alexandria, VA 22314, <br><br> *Plaintiff*, <br><br> v. <br><br> COMMISSION ON SECURITY & <br> COOPERATION IN EUROPE, <br> 234 Ford House Office Building <br> Washington, DC 20515, <br><br> Serve: Commission on Security & <br>          Cooperation in Europe, <br>          234 Ford House Office Building <br>          Washington, DC 20515 <br><br>          Rep. Joe Wilson, Chairman, <br>          1436 Longworth House Office Building, <br>          Washington, DC 20515, <br><br>          United States Attorney's Office <br>          for the District of Columbia, <br>          Attn: Civil Process Clerk <br>          555 4th St., NW <br>          Washington, DC 20530, <br><br>          Merrick B. Garland, Attorney General, <br>          950 Pennsylvania Avenue, NW <br>          Washington, DC 20530-0001, <br><br> *Defendant*. | Case No. _____ |

### CIVIL COMPLAINT FOR EQUITABLE AND MONETARY RELIEF
### AND DEMAND FOR JURY TRIAL

Plaintiff Steven Schrage, through counsel, files this civil complaint and jury demand for

violations of the Congressional Accountability Act, 2 U.S.C. § 1301 *et seq.* ("CAA"), and 42

U.S.C. § 2000e *et seq*. ("Title VII"), as applicable to Defendant Commission on Security & Cooperation in Europe ("the Helsinki Commission" or "CSCE") as per the Congressional Accountability Act of 1995 ("CAA"), as amended by the CAA 1995 Reform Act of 2018. 2 U.S.C. § 1311 *et seq*.

**Jurisdiction and Venue**

1. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 2 U.S.C. § 1408(a) because it asserts claims that arise under the CAA.

2. On October 15, 2024, Plaintiff filed a timely claim under 2 U.S.C. § 1402 and has not submitted a request for a hearing on the claim. Therefore, Plaintiff is within the 70-days from October 15, 2024, to "file a civil action in a District Court of the United States with respect to the violation alleged in the claim" pursuant to 2 U.S.C. § 1401(b)(1).

3. Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because the Defendant's headquarters is in this judicial district and the alleged violations took place in this judicial district.

**Parties**

4. Plaintiff was Defendant's Executive Director/Staff Director at the time the claim arose and resides in Alexandria, Virginia.

5. Pursuant to 2 U.S.C. § 1301(b)(1), individuals employed by the Helsinki Commission are "covered employees" under the CAA.

6. Pursuant to 22 U.S.C. § 3008(d)(1), Plaintiff was, until his termination, a Congressional employee as an employee of Defendant.

7. Pursuant to 2 U.S.C. § 1301(b)(2), the Commission on Security & Cooperation in Europe, also known as the Commission or CSCE, is an "employing office" under the CAA.

2

8. Pursuant to 2 U.S.C. § 1408(b), the "employing office" shall be the defendant in a CAA civil action.

## FACTUAL ALLEGATIONS

1. On or about March 13, 2023, Representative Joe Wilson of South Carolina, Chairman of the Commission on Security & Cooperation in Europe ("Commission" or "CSCE") appointed Plaintiff Steven Schrage, Ph.D., as the Executive Director (legally "Staff Director") of the CSCE Commission.

2. Jonathan Day, Chairman Wilson's personal office Chief of Staff, recruited Dr. Schrage from his role at Johns Hopkins School of Advanced International Studies ("SAIS") to be CSCE Staff Director following Dr. Schrage's anti-human trafficking and humanitarian work at Ukraine's border during Russia's 2022 active military attacks and full-scale invasion of Ukraine.

3. At an introductory dinner Dr. Schrage arranged with Kyle Parker, the Senior Staff Representative appointed by Co-Chairman Senator Ben Cardin, to encourage open and collaborative work, Mr. Parker told Dr. Schrage that he did not view Chairman Wilson as the full, legal CSCE Chairman; that Mr. Parker had authority to conceal from Chairman Wilson and other CSCE leaders actions he took or tasked the CSCE staff to do based on his long CSCE tenure; that Mr. Parker was not subject to Congressional ethics rules, which could not be enforced against him; that while he was a U.S. official and actively promoting himself as such in the media and generally, Mr, Parker routinely traveled "unofficially" without government authorization to Ukraine and actively encouraged other CSCE staff, such as Paul Massaro, to do the same; that while on these unofficial and unauthorized trips Mr. Parker wore foreign military gear, put U.S. elected officials' names on bombs intended for Russia, and received gifts and lodging from Ukrainian officials and others; and that Mr. Parker advocated for foreign officials

3

and others that provide him aid in these unofficial trips, including "brokering" a Washington Post article promoting a Ukrainian military official (who was fired shortly thereafter). Mr. Parker also asserted that no one could legally "stop" him from these activities and that he had established special "friends" of the CSCE (including foreign government officials and a prominent foreign financier) who were given special access and influence over the CSCE and were personally close to Mr. Parker.

4. Dr. Schrage found Mr. Parker's statements troubling but stated to Mr. Parker that while he was still learning the CSCE structure, the most important thing was that they worked together collaboratively to advance the CSCE's work consistent with legal requirements. To do so, Dr. Schrage asked Mr. Parker to join him at the head of his initial staff meetings and took other steps to encourage full transparency on CSCE work.

5. While Dr. Schrage conducted initial introductory meetings with staff, several current and former staff informed Dr. Schrage of ongoing sexual and racial discrimination, antisemitism, and other unaddressed misconduct. Past incidents included matters covered by major news outlets detailing that Co-Chairman Cardin authorized a $220,000 payment to a former African American CSCE staffer who complained of sexual mistreatment by another CSCE Commissioner and abusive behavior designed to undermine her legal rights by Congressional attorneys representing CSCE.

6. More recent concerns largely focused on the actions of Mr. Parker and Mr. Massaro. After then Chairman Cardin reappointed Mr. Parker as CSCE's Staff Director in 2021, four of the top five most experienced CSCE staff left, leaving little senior staff oversight and removing any guardrails around Mr. Parker. Then staff reported that Mr. Parker had acted aggressively to block the hiring or drive away staff that would question or review his conduct.

7. These concerns about Mr. Parker's interactions with staff deepened after a woman whom several CSCE Commissioners had already approved to replace the former Communications Director who departed after conflicts with Mr. Parker (including Mr. Parker saying "anyone could do her job") emerged from a private initial meeting with Mr. Parker so traumatized that she immediately withdrew from the position, stating that she would never work with Mr. Parker.

8. After this incident, Mr. Day informed Dr. Schrage that due to this and the other staff reported racial and sexual matters involving Mr. Parker, the Congressional Accountability Act (CAA) imposed a legal obligation on the CSCE to investigate Mr. Parker's alleged misconduct and discrimination against staff. Dr. Schrage made repeated requests to have this investigation led by an outside entity to avoid disrupting CSCE operations and management, but Mr. Day refused. Under Chairman Wilson's authority, Dr. Schrage and Michael Geffroy, the Commission's new General Counsel, were then tasked to conduct the investigation.

9. Dr. Schrage and Mr. Geffroy closely coordinated their investigation with Mr. Day, and later with attorneys from the Office of House of Representatives Counsel ("OHEC") including Russell Gore, Ann Rogers, and Kunti Salazar, who provided advice and edited documents and communications on this and related matters.

10. In or about May 2023, during an CSCE election observation mission in Turikye, Mr. Parker acted contrary to U.S. Ambassador guidance and in violation of election observation rules and local laws, instigating an armed police incident, which Mr. Parker then concealed from Chairman Wilson and Dr. Schrage.

11. When Mr. Parker refused to respond to questions about this incident, Dr. Schrage informed Mr. Parker that if he refused to answer questions about this and other troubling

behavior reported by staff, the incidents would have to be legally reviewed and investigated. Mr. Parker still refused to cooperate or to recognize that Chairman Wilson's authority required him to be informed of Mr. Parker's foreign activities and contacts.

12. After Mr. Parker learned his actions were being reviewed by Dr. Schrage and Mr. Geffroy, he privately discussed with CSCE Commissioner Senator Roger Wicker a decision to take action to get rid of Dr. Schrage and Mr. Geffroy (a war veteran supporting his family who had just left the private sector to join the CSCE, with Senator Wicker approving his hiring) and discussed strategies to remove them.

13. During the Spring and Summer of 2023, Dr. Schrage and Mr. Geffroy conducted their initial CAA investigation and continually reported their findings and recommendations, along with the evidence they collected, to Mr. Day. This included their recommendation that CSCE refer potential criminal and national security matters to relevant outside agencies for review.

14. The evidence Dr. Schrage and Mr. Geffroy compiled included a 2020 memorandum to then Chairman Cardin and Christopher Lynch, his personal Chief of Staff, by a former CSCE Staff Director, who was African American, and other materials notifying Chairman Cardin and Mr. Lynch of sexism (*e.g.*, Mr. Parker deriding efforts to include women as based on "what is swinging between one's legs" and "un-American" and having CSCE's most senior woman official cancel travel with Mr. Parker due to his loud discussion of a "ceramic cock"), racism (*e.g.*, Mr. Parker told CSCE's only remaining African American staffer the first time he saw her in person that, "I never would have hired you;") anti-semitism (with Jewish groups complaining about Mr. Massaro's social media postings "boosting Holocaust perpetrators" and Mr. Massaro stating to a CSCE official at a wreath laying at the Dachau

6

concentration camp that "Hitler wasn't that bad."), mismanagement, and corruption by Mr. Parker.

15. This 2020 memorandum notifying Senator Cardin and Mr. Lynch of discrimination by Mr. Parker and others should have triggered them to promptly investigate. Yet there is no evidence that such an investigation occurred before Senator Cardin promoted Mr. Parker, despite these warnings, even though Senator Cardin publicly served as the CSCE's Special Representative for Racism, Sexism and Intolerance.

16. Additionally, during their inquiry, Mr. Geffroy discovered that Mr. Parker received at least $30,000 in cash and managed exports for Ukrainian officials, and that Mr. Parker and Mr. Massaro launched a CSCE initiative to pressure U.S. export control agencies to change policies in ways could benefit those making the cash payments to Mr. Parker. Mr. Geffroy conferred with the Treasury Foreign Agent Registration Act (FARA) Unit Chief, who flagged these acts as likely indicating criminal FARA violations by Mr. Parker, which can be punished by up to two years in prison.

17. Later in July 2023, a source who reported working with the U.S. Department of Homeland Security to identify foreign threats, reported to CSCE officials that Mr. Parker and Mr. Massaro were wittingly or unwittingly being manipulated by foreign assets tied to Ukrainian and Russian interests. This included Mr. Parker and Mr. Massaro engaging controversial former Russian Duma Member Ilya Ponomarev in their official CSCE capacities to discuss U.S. support for a "Wagner-style" coup in Russia. After the House Sergeant at Arms did an initial vetting of the source and credibility of their allegations, Chairman Wilson, Co-Chairman Cardin, and Ranking Members Wicker and Representative Steve Cohen unanimously agreed to refer these issues to the Federal Bureau of Investigation (FBI). During Mr. Geffroy's last contact with the

FBI, the FBI indicated the reported counterintelligence issues concerning Mr. Parker and Mr. Massaro were being taken "very seriously."

18. Additionally, the Sergeant at Arms conducted a thorough review of CSCE's security procedures after being notified of the counterintelligence issues involving Mr. Parker. The Sergeant at Arms expressed concern regarding Mr. Parker's written assertion that Chairman Wilson had no authority to be informed of Mr. Parker's foreign contacts or activities, and found that under Mr. Parker and Everett Price, his hand-picked CSCE security manager, CSCE failed to meet key security requirements for years, including failing to make mandatory reports about their foreign contacts. Mr. Parker and Mr. Price objected to the new security procedures established based on the Sergeant at Arms' recommendations.

19. From in or about the end of July through September 2023, Chairman Wilson attempted to arrange a private meeting with Co-Chairman Cardin for Dr. Schrage and Mr. Geffroy brief them on their investigation findings, but Mr. Lynch continually declined to schedule this meeting. Nevertheless, Dr. Schrage and Mr. Geffroy worked closely with Chairman Wilson, Mr. Day, and the OHEC attorneys to continue to review and revise their initial report materials. This included a cover letter for the report from Chairman Wilson that called for actions to protect staff and prevent witness tampering, and to urgently refer legal, criminal, and national security matters to appropriate federal agencies.

20. Also, during this time frame, unbeknownst to Dr. Schrage, while delaying the meeting between the CSCE Chairman Wilson and co-Chairman Cardin, Mr. Lynch instructed Mr. Parker to compile a memorandum of alleged staff complaints against Mr. Geffroy and Dr. Schrage. The select CSCE staffers Mr. Parker organized to generate these allegations included several implicated in Mr. Parker's security or sexual mistreatment allegations (including Mr.

8

Massaro and Mr. Price) or those who Mr. Parker promised support for an extraordinary raise (*e.g.*, Jordan Warlick) or to shield from adverse personnel actions (*e.g.*, Michael Cecire).

21. After multiple attempts to arrange the Chairman and Co-Chairman briefing, Mr. Lynch, Senator Cardin, Senator Wicker, and Representative Cohen were provided a full copy of the CAA initial investigation report, binder of evidence, and cover letter from Chairman Wilson calling for immediate actions to protect staff and immediate referral of criminal, legal, and national security matters to appropriate outside federal agencies.

22. When a meeting was finally agreed to between Chairman Wilson and Senator Cardin, Dr. Schrage and Mr, Geffroy were excluded. After the meeting, the OHEC attorneys who attended the meeting informed Dr. Schrage and Mr. Geffroy that Senators Cardin and Wicker had indicated that Mr. Parker raised allegations against Dr. Schrage and Mr. Geffroy but refused to provide Chairman Wilson with any information about these secret allegations. Furthermore, the OHEC attorneys instructed Dr. Schrage and Mr. Geffroy that they [the attorneys] were now banned from talking with them on these matters, even though Dr. Schrage and Mr. Geffroy worked with the OHEC attorneys for months on the investigation and related matters. Also, despite their conflicted status, the OHEC attorneys stated that they would now be utilized in an investigation against Dr. Schrage and Mr. Geffroy.

23. Additionally, Senators Cardin and Wicker blocked the actions Chairman Wilson recommended be taken to protect staff and prevent witness tampering. For example, the Senators blocked Chairman Wilson's call for Mr. Parker to either be fired or placed on paid leave and to refer the criminal, legal, and security matters to appropriate federal agencies, including obstructing Dr. Schrage and Mr. Geffroy from continuing to engage the FBI and Treasury officials on the potential criminal matters concerning Mr. Parker that were already flagged.

24. Chairman Wilson, in a series of statements, meetings, and formal letters, objected to using the undisclosed allegations against Dr. Schrage and Mr. Geffroy to open an investigation, and stated that any such investigation would be illegal "whistleblower retaliation" against them under the CAA. Chairman Wilson also rejected the idea that secret charges against Dr. Schrage and Mr. Geffroy could be hidden from him, given his role as their supervisor. Despite this, in November and December 2023, Mr. Day, in coordination with Senate officials, organized letters purporting to bear Chairman Wilson's signature approving such an investigation and later hiring the law firm Seyfarth Shaw to conduct it. At the time Seyfarth Shaw was selected to conduct this investigation, it was not disclosed to Dr. Schrage or Mr. Geffroy that the Senator's attorney, Erica Watkins (who had long advised Mr. Parker and Senators Cardin and Wicker), had been an associate at the firm.

25. Upon seeing the letter hiring Seyfarth Shaw, Chairman Wilson reaffirmed that he had never authorized this action. On December 13, 2023, Chairman Wilson personally reviewed and hand-signed a letter to Mr. Day objecting to and rescinding the hiring of Seyfarth Shaw. Later that day, Chairman Wilson met with the OHEC attorneys (Ms. Rogers, Mr. Gore, Ms. Salazar) and Mr. Day, all of whom were directly involved in launching the Seyfarth Shaw investigation, who then pressured Chairman Wilson to rescind his letter.

26. After this meeting, Chairman Wilson met with Dr. Schrage and Mr. Geffroy and relayed that OHEC counsel told him that he had no choice but to rescind his letter, as they had already moved forward with Seyfarth Shaw, and that he did so, which meant the investigation by Seyfarth Shaw would go forward. Chairman Wilson stated that he now believed Representative Cohen and Marilyn Dillihay, his personal office Chief of Staff, had been coordinating with and following the direction of Senator Cardin, and that under CSCE rules, Chairman Wilson could

10

not protect Mr. Geffroy from whistleblower retaliation, including termination, if the other top three Commissioners voted in favor. In contrast, Chairman Wilson committed to protecting Dr. Schrage, stating that as Staff Director, only Chairman Wilson could terminate Dr. Schrage and requested that Dr. Schrage not resign despite the circumstances. Dr. Schrage, relying on this, and Chairman Wilson's additional commitment to Dr. Schrage that he would be informed of any allegations against him and be given the opportunity to address them, agreed to stay.

27. Repeatedly, both before and after these events, Chairman Wilson made clear to Dr. Schrage and Mr. Geffroy that they should have fully funded counsel provided by CSCE or through the Congress. Chairman Wilson supported their decision to obtain counsel through the House of Representative's Office of Employee Advocacy (OOEA), which agreed to provide them with legal representation and to vigorously defend their rights.

28. On or about December 14, 2023, Mr. Day forwarded a letter from Chairman Wilson to Dr. Schrage and Mr. Geffroy stating that Mr. Day would need to review CSCE letters before they are signed by Chairman Wilson. The letter included a handwritten statement by Chairman Wilson expressing his support for Dr. Schrage and Mr. Geffroy. Mr. Day later sent an email to Dr. Schrage, whom up to that day Mr. Day had invited to stop by Chairman Wilson's office at any time, alleging that Dr. Schrage was disruptive and that Mr. Day would control his access to Chairman Wilson's office. In that email, Mr. Day also asserted that he was taking over a range of authorities that were legally Dr. Schrage's as CSCE's legal Staff Director, even though Mr. Day was a personal office employee in a separate legal entity with no legal CSCE role with or authority. Dr. Schrage replied, cordially requesting that he, Chairman Wilson, and Mr. Geffroy meet to discuss these matters, yet Mr. Day never responded. Dr. Schrage also discussed these matters with Chairman Wilson, who indicated that he never authorized Mr. Day

to assume these authorities and that Dr. Schrage was welcome to his office at any time.

29. Mr. Day and staff under his supervision, including Stephanie Pendarvis, then became increasing hostile to Dr. Schrage, including attempting to physically block Dr. Schrage from entering Chairman Wilson's office to attend meetings that Chairman Wilson specifically requested Dr. Schrage attend and loudly protesting when Dr. Schrage appeared in the office. Ms. Pendarvis alleged to the OHEC lawyers that Dr. Schrage was attending meetings uninvited, which Dr. Schrage proved to be false through texts and emails from Chairman Wilson.

30. On December 22, 2023, Dr. Schrage filed a timely CAA claim under 2 U.S.C. § 1402 with the Office of Congressional Workplace Rights ("OWCR") alleging retaliation for activity protected by the CAA.

31. On February 15, 2024, L. Wilhite, Director, OOEA, sent Dr. Schrage an email explaining that the Office of the Chief Administrative Officer (CAO) instructed OOEA to not provide representation to Dr. Schrage and "to cease providing services to any current Commission clients." On being informed of this decision to strip Dr. Schrage and all CSCE complainants of their legal rights to Congressional Counsel, Chairman Wilson reiterated that Dr. Schrage and Mr. Geffroy should have legal fees covered by CSCE and the Congress. Both Chairman Wilson and the OHEC attorneys had previously expressed that CSCE employees were legally entitled to representation by OOEA and did not indicate there was any question about this right until Dr. Schrage and Mr. Geffroy called for the OHEC attorneys who previously advised them to be removed from the investigation against them due to their conflicts.

32. On or about January 16, 2024, Seyfarth Shaw attorneys provided Dr. Schrage with a memorandum written by Mr. Parker dated September 11, 2023, making allegations against Dr. Schrage and Mr. Geffroy, and relying on false statements which were easily disprovable. Mr.

12

Parker's memorandum also revealed that he called for Senators to target Dr. Schrage and Mr. Geffroy specifically as individuals who could be up for Senate confirmation in the next Republican Administration and to threaten to destroy their future careers in government service to obstruct the investigation they were conducting. Mr. Parker also called for targeting Dr. Schrage because he cooperated with a U.S. Department of Justice investigation into what is referred to as the Steele dossier and related Russian disinformation.

33. On February 9, 2023, attorneys for Seyfarth Shaw interviewed Dr. Schrage for several hours with his counsel present. During the questioning, it was apparent to Dr. Schrage that the Seyfarth Shaw attorneys did not deeply examine specific allegations against Mr. Parker, for example, accepting Mr. Parker's blanket assertions he had exceptions to receive gifts from foreign sources without asking him to provide corroborating evidence.

34. While the investigation was still ongoing, Mr. Parker leaked information to the press and made false statements impacting Dr. Schrage, Mr. Geffroy, Chairman Wilson, and others. The New York Times ran a story entitled *Senate Aid Investigated Over Unofficial Actions in Ukraine* in which Mr. Parker falsely claimed the investigation against him was initiated in retaliation for his earlier complaints against Dr. Schrage and Mr. Geffroy, which was factually impossible based on the timing, and attempted to explain his travel to Ukraine. The New York Times quoted but concealed the identity of Jonathan Winer, Mr. Parker's lawyer, and a former FARA representative for a Putin-linked Russian oligarch, which then also concealed Mr. Winer's conflict and role as a courier of the Steele dossier to State Department officials and Mr. Winer's personal interest in targeting Dr. Schrage who cooperated with investigations discrediting the Steele dossier. Following this story, Dr. Schrage's Wikipedia page was vandalized, with the names of several former State Department colleagues close to Mr. Winer inserted. Additionally, Politico

published a story entitled *A Washington Bulwark Against Putin is Being Rocked by Internal Strife. Is it Simple Dysfunction – or Something Worse?* which referred to Mr. Parker as a "hero," discussed the confidential internal investigation being conducted by Seyfarth Shaw; presented Mr. Parker's defenses to the allegations against him; and made assertions that Dr. Schrage was somehow pro-Putin.

35. Chairman Wilson told Dr. Schrage that all the senior CSCE Commissioners involved knew that Mr. Parker's statements in the New York Times and Politico articles were false and factually impossible based on the timeline of events as the investigation into Mr. Parker launched in the Spring 2023, and Mr. Parker did not write his memorandum, which referenced the investigation and charges against him, until months later in September.

36. On March 22, 2024, Chairman Wilson wrote to Dr. Schrage that Seyfarth Shaw's report fully "vindicated" Dr. Schrage. This was followed up by conversations between Dr. Schrage and Chairman Wilson wherein Chairman Wilson reiterated that Seyfarth Shaw had not found that Dr. Schrage did anything illegal or improper and included notable positive statements about Dr. Schrage from staff. Chairman Wilson also indicated that Co-Chairman Cardin would be stepping down following the findings in the report and instructed Dr. Schrage to arrange a meeting with staff for Senator Sheldon Whitehouse, whom he said would be taking over the CSCE role of Co-Chair. Chairman Wilson also made it clear that Dr. Schrage needed to meet with the Chairman and Mr. Day, who he would direct to stop obstructing Dr. Schrage's efforts and move forward. Despite this, both Senator Whitehouse's staff and Mr. Day refused to meet with Dr. Schrage.

37. On April 18, 2024, Dr. Schrage arrived at CSCE for what he was told was the meeting with Chairman Wilson and Mr. Day, that Mr. Day had previously delayed. Instead, Ms. Dillihay, Chief of Staff for Congressman Steve Cohen, was also present, despite having no legal

role with the Commission and Representative Cohen having no legal authority over Dr. Schrage's position. Ms. Dillihay stated to Dr. Schrage that "they," without specifying whom, reached a decision to end Dr. Schrage's employment at CSCE. Dr. Schrage then requested to have his attorney present given that Ms. Dillihay had no CSCE role or authority over Dr. Schrage, but Ms. Dillihay refused so Mr. Schrage calmly departed the office.

38. To this date, CSCE has not provided Dr. Schrage any basis for his termination besides an email from Ms. Dillihay broadly citing claims of a "negative management" style.

39. Plaintiff has sustained economic damages and mental anguish as the result of Defendant's illegal actions and will continue to sustain damages into the future.

## COUNT I
### Retaliation
### Congressional Accountability Act
### 2 U.S.C. § 1317

40. Dr. Schrage hereby incorporates the allegations set forth in the foregoing paragraphs as though fully alleged herein.

41. Dr. Schrage, at the time of his termination, was an employee of the Commission pursuant to 22 U.S.C. § 3008(b)(1).

42. Dr. Schrage, at the time of his termination, is a "covered employee" as defined by 2 U.S.C. § 1301(a)(3) pursuant to 2 U.S.C. § 1301(b)(1)(A), as an employee of the Commission.

43. Pursuant to 2 U.S.C. § 1301(b)(2), the Commission is an "employing office" under the CAA.

44. Dr. Schrage engaged in activity protected by the CAA when he initiated and completed an investigation into the alleged discrimination by CSCE staff and when he filed a complaint on December 22, 2022, alleging retaliation in violation of the CAA.

45. The Commission illegally subjected Dr. Schrage to retaliation for his protected

activity when it terminated him within a short time after he engaged in activity protected by the CAA.

46. Dr. Schrage has sustained damages as the result of the Commission's illegal retaliation in violation of the CAA, including, but not limited to, damage to his career, and emotional, mental, and physical distress.

47. Dr. Schrage is entitled to such legal or equitable relief as will effectuate the purposes of the statute, including but not limited to economic and compensatory damages, and reasonable costs and attorneys' fees.

## RELIEF REQUEST

Based on the foregoing, Dr. Schrage respectfully requests that he be awarded the following relief against the Commission:

a. Reinstatement or, in lieu thereof, full lost pay and benefits, including future employment damaged by CSCE actions;

b. Economic damages for lost compensation and benefits and damages to Schrage's career, reputation, and earning capacity in an amount to be determined;

c. Compensatory damages, including but not limited to pain and suffering, emotional distress and reputational damage;

d. Injunctive and declaratory relief;

e. Reasonable costs and experts' and attorneys' fees; and

f. Any other such relief that a court may deem just and equitable.

## JURY DEMAND

Plaintiff demands a jury for all issues proper to be so tried.

Respectfully submitted,

                                      /S/_____
Debra D'Agostino
D.C. Bar No. 481942
Federal Practice Group, LLP
801 17th Street, N.W., Suite 250
Washington, D.C. 20006
Tel: (202) 862-4360
Fax: (888) 899-6053
ddagostino@fedpractice.com

Counsel for Plaintiff